# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

GAIL GIRERD as personal representative of the
ESTATE OF CHRISTOPHE GIRERD,

Plaintiff-Appellee,

v

SANA ENERGY & MANAGEMENT, INC. and
MY05, LLC,

Defendants-Appellants.

UNPUBLISHED
June 19, 2018

No. 336818
Wayne Circuit Court
LC No. 15-013440-NO

---

Before: CAMERON, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

Christophe Girerd cut his toe on a rusty piece of metal protruding from the base of a pump at defendants' gas station. The wound never healed, resulting in the amputation of his toe, and Girerd filed suit. Defendants sought summary dismissal of Girerd's premises liability action, asserting that they lacked notice of the dangerous condition before Girerd's accident and that the condition was open and obvious. The circuit court found triable questions of fact on these issues. Viewing the record evidence presented thus far in the light most favorable to the nonmoving party, we affirm.

## I. BACKGROUND

On the afternoon of October 23, 2013, Christophe Girerd filled up at a Shell Station in Harper Woods owned by MY05, LLC, and operated by Sana Energy & Management, Inc. Girerd was wearing sandals and as he walked past "Pump #3," he sliced his left little toe on a piece of metal sticking out from a cracked and bent metal skirt surrounding the cement base (or island) on which the pump stood. In his complaint, Girerd described that "the piece of metal . . . was not adherent to the island and was sticking out due to erosion, decay and rusting of the metal framing." At his deposition, Girerd indicated, "A piece of steel lay on the ground, struck me right inside my baby toe," but then clarified, "It was disconnected from the concrete," "you could see part of steel was bent up the concrete," and "the concrete was just in no kind of maintenance

-1-

and the concrete was in bad shape."[1]  Girerd described that the piece of steel jutting from the island was approximately three to four centimeters long (which he also mistakenly identified as two to three "feet" at one point) and 10 centimeters wide.  He explained that the jutting piece of metal had cut the top of his little toenail in half.  Girerd saw the metal only after he cut his toe.

Following his accident, Girerd informed the gas station attendant, "Walee," about his injury.  Girerd told Walee where the bent metal was located and that it needed to be removed, and the next day it was gone.  Girerd's daughter returned to the gas station two days later and snapped photographs of the area, depicting a completely rusted and largely eroded metal plating around the island.

The wound on Girerd's toe did not heal and he sought medical attention in January 2014.  Eventually, doctors amputated the toe.  A subsequent biopsy revealed that Girerd had "developed Squamous Cell Carcinoma in the left little toe—a cancer which develops due to chronic infection and inflammation."  Unfortunately, the cancer spread and Girerd passed away during the pendency of his case.  His wife Gail continued the suit as the personal representative of his estate.

Girerd filed a premises liability action against defendants.  He asserted that defendants "had actual and/or constructive notice" of the condition of the island before his injury.  Girerd further asserted that defendants breached the duty of care owed to its business invitees by failing to properly maintain the gas pumps and failing to remove metal fragments jutting from the islands.  Girerd posited that defendants had a duty to warn its customers of the dangerous condition as it was "an exposed, low to the ground, unexpected, sharp piece of metal, which blended in with its surroundings" and therefore was not readily ascertainable by unsuspecting customers.

During discovery, Girerd's counsel deposed the owners and employees of the gas station.  Fahd Ahmed indicated that he owns a 50% share of the station and had taken sole responsibility for property maintenance.  Ahmed visited and inspected the property "several times per week."  In relation to the islands on which the gas pumps sat, Ahmed testified that he would paint them, as well as other exterior fixtures, regularly as part of "an exterior refresh."  Sometimes before being painted, he found the metal skirting on the bottom of the islands as deteriorated as that depicted in the photographs, Ahmed admitted.  However, Ahmed had never "seen a piece of the metal skirting sticking out," and if he had, he would have had it repaired.

---

[1] Girerd emigrated from France in 2009.  He was not a native-born English speaker and often had to clarify or correct his testimony during the deposition.

Hussein Ajami co-owns the station with Ahmed. Ajami asserted that the gas pump islands at his station had never deteriorated to the point depicted in the photographs allegedly taken by Girerd's daughter. He had never noticed metal peeling away from the islands and claimed that he did not even know that metal plating was hidden under the gray paint.

Albara Abuzaid worked at the gas station on October 29, 2013, but denied that anyone notified him of being injured that day. Abuzaid was not responsible for property maintenance, other than to empty the exterior garbage cans and sweep the parking lot every six to 12 hours. While performing these tasks, Abuzaid would inspect the area as well. Abuzaid could not remember the condition of the islands on the day in question, but claimed he had never seen them in the poor condition depicted in the proffered photographs. And he had never seen a piece of metal jutting off an island that required repair.

Donetta Moss testified that "Tony" hired her at the gas station to run the lottery machine beginning in April 2014, but that she no longer worked there. One day while Moss worked with "Wally," a woman named Yolanda came into the station. Yolanda told Moss that Girerd had told Wally that he had cut his toe badly at the station. Yolanda then pointed out Girerd's wife, who was at the station at that time. Yolanda told Moss about Girerd's medical issues and Moss recounted to Yolanda that "Wally told me that Mr. Girerd hurt his toe outside of the gas station because of the metal and it being broke up out there." Moss further testified that Wally directly told her that Girerd cut his toe "on the metal trimming or skirting around the gas station pumps." Wally imparted this information one day when Girerd visited the station. Moss further indicated that she had personally experienced trouble with the corroding skirting on the islands. On July 7, 2014, she hit a piece of broken metal at Pump #7 with her car tire and took a picture in case her tire went flat.

Waled Al-Mazhami testified that he had worked for Ahmed at his gas stations on and off for several years. Al-Mazhami admitted that some people call him "Wally" or "Tony." He claimed that he was unaware of Girerd's injury until informed at the deposition and that Girerd did not report the injury to him. Moreover, he never told Moss that anyone "cut his foot" at the gas station. If he had been notified of any injury, Al-Mazhami asserted, he would have passed the information along to Ahmed. Al-Mazhami further denied that the islands were ever in the state of disrepair depicted in the photographs presented as Ahmed regularly paid a contractor "to paint everything." And, Al-Mazhami avowed, he had never seen a piece of metal "sticking out from the gas pump island."

At the close of discovery, defendants sought summary disposition of Girerd's complaint based on their lack of notice "of any piece of grey metal lying in the parking lot before the incident in question" or "that a piece of metal had broken off of the skirting surrounding the gas pump islands." Relying on the depositions of its various employees and officers (but ignoring that of Moss), defendants contended that there was no evidence that Girerd notified them of the accident after it occurred. Defendants further asserted that if the condition had existed, it would have been open and obvious to a reasonable person upon casual inspection, eliminating their

duty to warn. Indeed, defendants argued, Girerd admitted at his deposition that he saw the metal after his injury.[2]

Girerd retorted that defendants had at least constructive notice of the dangerous condition at issue. The level of deterioration depicted in the photographs he presented revealed that the metal around the island had been in disrepair for some time. Defendants either knew or should have known of the condition as its employees inspected the premises "on a frequent and regular basis." Moreover, Ahmed admitted at his deposition that metal protruding from the island would be a dangerous condition. Girerd denied that the condition was open and obvious as the piece of metal was only two to three centimeters long and blended in with its surroundings. Comparing this case to *Price v Kroger Co of Mich*, 284 Mich App 496, 501-502; 773 NW2d 739 (2009), Girerd contended that the dangerous condition was not readily visible upon casual inspection as it was small and low to the ground.

At the motion hearing, defendants argued that the allegedly dangerous condition was open and obvious, citing Girerd's deposition testimony that "he had no problem seeing" the metal when he looked down after cutting himself. Defendants contended that there was no evidence that the broken metal was concealed and noted that its alleged level of corrosion "would have stood out" against the gray pavement. Defendants further denied that the condition was unavoidable or that any special aspect removed this condition from the open and obvious danger doctrine. Defendants continued by denying any notice of the condition. "Nothing connect[ed] this piece of grey corroded steel to the skirting surrounding the gas pumps," defendants argued. None of its employees saw the metal breaking off or ever received a complaint about the condition, defendants insisted.

Girerd responded that defendants should have been on notice of the deteriorating condition of the pump islands given their "at least daily inspection of the premises" and given the lengthy period that the condition must have existed.

The circuit court denied defendants' motion, ruling:

[T]he photographs presented by the plaintiff show that the condition of the skirting around the island is clearly in bad shape. It appears as though a dangerous condition existed. And it also looks like it existed for a length of time. However, would an invitee be aware of this dangerous condition upon a casual inspection, making it open and obvious? I do think this is a question of fact. And the defendant cast out [sic] on plaintiff's testimony that he cut the top of his toe and not the bottom from the piece of metal. And again, this poses a question of fact.

---

[2] Defendants also argued that Girerd could not establish a causal connection between his accident and his development of cancer. The circuit court found the motion "premature" in this regard as Girerd's doctor had yet to be deposed. Defendants do not challenge this ruling on appeal.

Defendants subsequently filed an interlocutory application for leave to appeal the circuit court's denial of its motion for summary disposition based on notice and the open and obvious nature of the subject condition, which this Court granted. *Girerd v Sana Energy & Mgt, Inc*, unpublished order of the Court of Appeals, entered May 12, 2017 (Docket No. 336818).

## II. ANALYSIS

We review de novo a circuit court's denial of a motion for summary disposition. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate . . . if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Id*. at 139-140 (quotation marks and citations omitted).]

Premises owners owe a duty to their business invitees "to inspect the premises for hazards that might cause injury," to take steps to make the premises safe, and to warn "of any known dangers." *Price*, 284 Mich App at 500. As noted, defendants contend that they lacked notice of the allegedly dangerous condition in this case, negating their duty to repair or warn.

In *Conerly v Liptzen*, 41 Mich App 238, 241; 199 NW2d 833 (1972), this Court recognized that a landowner's knowledge of the "actual conditions" of the premises requires adequate inspection to discover latent dangers:

> "The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use." [Quoting Prosser, Torts (3d ed), § 61, pp 402-403.]

In *Prebenda v Tartaglia*, 245 Mich App 168, 169; 627 NW2d 610 (2001), this Court more recently explained that "[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land" if the possessor

> (a) knows, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such invitees, (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Michigan caselaw on the issue of notice closely mirrors the Restatement:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger. [2 Restatement Torts, 2d, § 343, pp 215-216.]

Indisputably, a landowner's duty encompasses reasonable inspection intended to detect dangerous conditions. And the evidence presented thus far in this case, viewed in the light most favorable to Girerd, showed that defendants had conducted this inspection and should have noticed the condition. Defendants' owners and employees testified that they regularly inspected the premises and remedied conditions that might cause injury. They claimed that the islands were painted semi-regularly to improve the aesthetics of the gas station.

However, the photographs taken by Girerd's daughter two days after the accident reveal that the islands were in rough condition. Rusted, corroded metal covered in chips and tears is clearly visible as the gray paint had mostly worn away. Ahmed admitted that he allowed the islands to deteriorate to this condition before repainting them. Moreover, Moss testified that the islands remained in disrepair eight months later and presented photographs proving this point.

"Generally, the question of whether a defect has existed a sufficient length of time and under circumstances that the defendant is deemed to have notice is a question of fact, and not a question of law." *Banks v Exxon Mobil Corp*, 477 Mich 983, 984; 725 NW2d 455 (2007). And a finding of constructive notice often depends on the passage of time; the longer a defect is present the stronger the evidence of constructive notice. An invitor is liable when an unsafe condition "is known to the storekeeper or is of such a character or has existed a sufficient length of time that he should have knowledge of it." *Carpenter v Herpolsheimer's Co*, 278 Mich 697, 698; 271 NW 575 (1937). "Notice may be inferred from evidence that the unsafe condition has existed for a length of time sufficient to have enabled a reasonably careful storekeeper to discover it." *Whitmore v Sears, Roebuck & Co*, 89 Mich App 3, 8; 279 NW2d 318 (1979).

The evidence presented, viewed in the light most favorable to the nonmoving party, was more than adequate to create a triable question of fact on the issue of notice. The pictures reveal that the islands were significantly rusted and corroded, a condition that would likely take months or years to develop, allowing defendants ample time to notice and rectify the condition.

Defendants further complain that they were entitled to summary disposition because the open and obvious nature of the subject dangerous condition negated their duty to warn their customers. "[W]here the dangers are known to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee."

*Riddle v McLouth Steel Prods Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992). The landowner's duty to warn is removed if the potentially dangerous condition "is wholly revealed by casual observation." *Novotney v Burger King Corp (On Remand)*, 198 Mich App 470, 474; 499 NW2d 379 (1993). As noted in *Price*, 284 Mich App at 501, quoting *Novotney*, 198 Mich App at 474, the duty to warn falls away "because 'an obvious danger is no danger to a reasonably careful person.' The test for an open and obvious danger focuses on the inquiry: Would an average person of ordinary intelligence discover the danger and the risk it presented on casual inspection?" In making this determination, we must "focus on the objective nature of the condition of the premises at issue, not the subjective degree of care used by the plaintiff." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 523-524; 629 NW2d 384 (2001). The proper question is not whether this plaintiff could or should have discovered the protruding metal, but whether the metal was observable to the average, casual observer. *Novotney*, 198 Mich App at 475.

The dangerous condition in this case is remarkably similar to that in *Price*. The plaintiff in *Price* cut her ankle on a small barb of wire protruding low to the floor from a bin holding sale merchandise. *Price*, 284 Mich App at 498. This Court described in *Price*, 284 Mich App at 501-502:

> Given the extremely small size of the offending barb and its location immediately adjacent to the wire bin at ankle level, we reject the circuit court's conclusion that, as a matter of law, plaintiff should have discovered it "upon casual inspection" of the bin. A jury could reasonably infer that a casual inspection of the premises in which plaintiff shopped would not have revealed the barb, in light of its small size, its location at close to floor level, the impediment to visibility posed by the bulk of the candy-filled bin, and [the store employee's] failure to detect the anomaly, notwithstanding her greater ability and opportunity to examine the bin before placing it in an area of the store accessible to shoppers like plaintiff.

So too here. Girerd was cut by a small piece of metal protruding from the island at foot level. Whether the shard was moored to the island and stuck out from it at ground level or lay on the ground immediately adjacent to the island and separated from the skirting, the shard was small and the same color as its surroundings. A reasonable jury could conclude that its size, location, and color rendered the sharp metal invisible on casual inspection. Accordingly, the evidence supports that an average person visiting the station would have no reason to suspect that a piece of metal needed to be avoided while navigating around the pumps. Girerd bore a

responsibility to detect those dangers that could be discerned on casual inspection.   Whether the piece of sharp metal met that standard is for a jury to decide, and the circuit court properly denied defendants' motion for summary disposition on this ground as well.[3]

        We affirm.


                        /s/ Karen M. Fort Hood
                        /s/ Elizabeth L. Gleicher

---

[3] The dissent contends that "overwhelming" evidence "suggests" that the metal object that sliced Girerd's toe was on the ground rather than jutting out from the skirt of a pump, and that "no reasonable jury" could conclude otherwise.  Respectfully, our colleague overlooks that it is our obligation to view the evidence and reasonable evidentiary inferences in the light most favorable to the nonmoving party rather than from the moving party's perspective.  While Girerd did indeed testify that the metal was "on the ground," he also testified that it protruded from the skirt surrounding the pump island, to which it was still attached.  The dissent discards this testimony because it was elicited by plaintiff's counsel and, according to the dissent, counsel's question might later be deemed "leading."  We would find the question proper and not leading.  But we are not the "deciders" of this evidentiary question.  When considering the propriety of summary disposition, it is our responsibility to consider the competent evidence of record rather than making guesses about what might happen at a trial.

There is no dispute in the record about the location of the cut on Girerd's toe: he unequivocally testified that the "top" of his toenail was deeply sliced by the metal.  How this could have happened if the metal was lying on the ground is a mystery the dissent ignores.  Further, the photos in evidence (admittedly taken several days later) clearly depict shards of metal extending outward from the skirting of the pump islands.  Viewed in the light most favorable to Girerd, a reasonable jury could readily determine that the piece of metal responsible for inflicting the toenail wound protruded from the island, was very low to the ground, and was not apparent on casual inspection.